Public Employee Labor Relations Board
No. 95-661

## APPEAL OF CITY OF NASHUA BOARD OF EDUCATION

### (New Hampshire Public Employee Labor Relations Board)

April 24, 1997

*Office of Corporation Counsel*, of Nashua (*James M. McNamee* and *Mary Anne Flynn Mueller* on the brief, and *Ms. Mueller* orally), for the petitioner.

*Craig, Wenners, Craig & Casinghino, P.A.*, of Manchester (*Vincent A. Wenners, Jr.* and *Stephanie J. Stergiou* on the brief, and *Mr. Wenners* orally), for the respondent.

HORTON, J. The petitioner, the City of Nashua Board of Education (city), appeals the decision of the New Hampshire Public Employee Labor Relations Board (PELRB) that the city committed an unfair labor practice when it laid off certain members of the respondent, AFSCME, Council 93, Local 365, Nashua School Custodian Union (union), and then hired various part-time employees, including some laid-off members of the union, to perform the same duties at reduced wages and benefits. On appeal, the city argues that the PELRB erred: (1) in finding that the city committed an unfair labor practice because the city's reorganization of its work force is a protected managerial right; (2) in failing to identify a specific statutory unfair labor practice in its ruling; and (3) in ordering a remedy that exceeds the PELRB's authority and that "is insufficiently clear to be implemented." We affirm.

The city and the union, the certified bargaining agent for all full-time custodians and janitors employed in the city's schools, *see* RSA 273-A:8 (1987), were parties to a collective bargaining agreement (CBA) for the period July 1, 1991, to June 30, 1992. The expired CBA did not contain an enforceable "evergreen clause," which would have provided for the automatic renewal or continuance

of the CBA following its expiration and during negotiations for a new CBA. *See Appeal of Town of Rye*, 140 N.H. 323, 324, 666 A.2d 948, 950 (1995). The parties' CBA generally provided for a five-day, eight-hour per day, workweek at wages exceeding nine dollars per hour. Further, the CBA contained a "management rights" article that essentially reserved to the city all major decisions about staffing, direction, and control of the work force, "[e]xcept as otherwise expressly and specifically provided" in the CBA.

Following the expiration of the CBA, the city and the union began negotiations for a new agreement. While negotiations were in progress, the city informed the union that it planned a reorganization in which twenty-eight full-time custodians would be laid off and replaced with over thirty part-time custodians. The part-time custodians would work twenty hours per week for seven dollars per hour, receive no fringe benefits, and perform the same job duties as the laid-off custodians. The city's decision to reorganize was not the subject of negotiations with the union. The city, however, invited the laid-off custodians to apply for the new part-time positions.

On March 24, 1995, the union filed an unfair labor practice charge against the city based on the city's reorganization plans. In its charge, the union stated that a pure lay-off would be neither a violation of the CBA nor an unfair labor practice. The union alleged, however, that the lay-off *in combination with* the hiring of part-time personnel constituted a violation of RSA 273-A:5, I(a), (b), (c), (f) and (g) (1987) and RSA 273-A:8, in that it amounted, *inter alia*, to a "unilateral change in the conditions of employment" and a violation of the CBA. The city responded to the charge with an answer and a motion to dismiss, both of which pointed to budgetary concerns and asserted that the reorganization fell within "managerial policy within the exclusive prerogative of the public employer," RSA 273-A:1, XI (1987). The union's objection to the motion to dismiss disputed the city's "managerial policy" arguments and contended that the city violated the status quo under the expired CBA by unilaterally changing terms and conditions of employment.

Following a hearing, the PELRB denied the city's motion to dismiss and determined that the city had committed an unfair labor practice. In denying the motion to dismiss, the PELRB reasoned: "While it is true that management is free to reorganize, the methods used to implement the reorganization are of interest to this Board when they greatly change terms and conditions of employment and so give rise to charges of unfair labor practices as in the present case." In finding an unfair labor practice, the PELRB concluded:

> The [city] has informed the full-time custodians who are to be laid off that they may apply for one of the thirty-one new

positions at lower wages and compensation. The offer is statutorily impermissible because it offers these new part-time employees unit work at a rate different from that which has been bargained.

The PELRB ordered the city to compensate "[t]he position of part-time custodian" at the hourly wage rate for full-time custodians and to grant vacation, sick leave, and other benefits on a pro-rated basis. This appeal by the city followed.

■ The city first argues that the PELRB's failure to identify a specific statutory unfair labor practice demonstrates the propriety of the city's actions and reveals that the PELRB merely found "unfairness." *See Bouchard v. City of Rochester*, 119 N.H. 799, 802, 409 A.2d 772, 774 (1979) (PELRB exceeded its authority by treating general unfairness as a statutory unfair labor practice). Although the PELRB's decision neither cites a specific subsection of RSA 273-A:5 nor provides an explanation of its legal analysis, *cf.* RSA 273-A:6, IX (Supp. 1996) (orders and decisions of PELRB shall contain findings of fact and conclusions of law), we interpret the decision as a conclusion that the city violated its duty to bargain in good faith when, during a status quo period, it unilaterally reorganized its custodial services and thereby unilaterally changed the terms and conditions of employment. *See Appeal of Alton School Dist.*, 140 N.H. 303, 307-08, 666 A.2d 937, 940 (1995). This interpretation of the PELRB's decision finds ample support in the theories advanced by the union to the PELRB. For example, the union alleged that the city's reorganization constituted a unilateral change in the conditions of employment, and the union's charge alleged a violation of RSA 273-A:5, I(g) — a general provision making it an unfair labor practice for a public employer to fail to comply with RSA chapter 273-A, including the obligation to bargain imposed by RSA 273-A:3, I (1987). Furthermore, we construe the PELRB's reference to the "statutorily impermissible" offer of part-time employment to laid-off custodians as a concrete *example* of the unfair labor practice, and not as the unfair labor practice itself. Indeed, a contrary interpretation on this last point would suggest that the city could have avoided a statutory violation simply by refusing to consider any employment applications from laid-off custodians; such a hiring policy would itself raise serious issues of unfair labor practices. *See* RSA 273-A:5, I(c); *see also Phelps Dodge Corp. v. Labor Board*, 313 U.S. 177, 186-87 (1941) (unfair labor practice under analogous provision of the National Labor Relations Act to discriminate in hiring based on union affiliation).

The primary question for our review, therefore, is whether the PELRB correctly determined that the city's reorganization of its work force constituted a unilateral change in violation of the status quo, rather than a protected managerial right under RSA 273-A:1, XI. "We defer to the PELRB's findings of fact, and, absent an erroneous ruling of law, we will not set aside the PELRB's decision unless the [city] demonstrates by a clear preponderance of the evidence that the order is unjust or unreasonable." *Appeal of Sullivan County*, 141 N.H. 82, 83-84, 677 A.2d 682, 683 (1996). Even if our interpretation of the PELRB's rationale is incorrect and the PELRB instead based its decision on other mistaken grounds, we "will sustain the decision if there are valid alternative grounds to support it." *Quinlan v. City of Dover*, 136 N.H. 226, 230, 614 A.2d 1057, 1059 (1992) (quotation omitted); *cf. Appeal of Sturm, Ruger & Co.*, 124 N.H. 506, 508-09, 474 A.2d 983, 984 (1984) (incorrect legal standard used in administrative determination is not ground for reversal if the same result would obtain under the correct standard).

■ In the absence of an enforceable "evergreen clause," a CBA expires on the termination date set forth in the agreement. *Appeal of Alton School Dist.*, 140 N.H. at 307, 666 A.2d at 940. After expiration of the CBA and during negotiations for a successor agreement, the parties' "obligations to one another are governed by the doctrine of maintaining the status quo." *Id.* Maintenance of the status quo "demands that all terms and conditions of employment remain the same during collective bargaining after a CBA has expired." *Appeal of Milton School Dist.*, 137 N.H. 240, 247, 625 A.2d 1056, 1061 (1993). We have explained that the status quo doctrine derives from RSA 273-A:3, I, which imposes the obligation to negotiate in good faith over the terms of employment, and from RSA 273-A:5, I(e) (1987), which makes it an unfair labor practice for a public employer to refuse to negotiate in good faith. *Appeal of Alton School Dist.*, 140 N.H. at 307-08, 666 A.2d at 940. A public employer's unilateral change in a term or condition of employment (whether during negotiations for an initial CBA or during a status quo period following expiration of a CBA) is tantamount to "a refusal to negotiate that term and destroys the level playing field necessary for productive and fair labor negotiations." *Id.* at 308, 666 A.2d at 940; *see also Litton Financial Printing Div. v. NLRB*, 501 U.S. 190, 198 (1991).

As both our cases and federal cases under the National Labor Relations Act indicate, however, the status quo doctrine is limited by its rationale. Thus, an employer is prohibited from making unilat-

eral changes on *mandatory* subjects of collective bargaining, but not on *permissive* topics of collective bargaining. *See Silverman v. Major League Baseball Player Comm.*, 67 F.3d 1054, 1059 (2d Cir. 1995). By definition, an employer must bargain over mandatory topics and may — but need not — bargain over permissive or "permissible" topics. *See Appeal of City of Concord*, 139 N.H. 277, 282, 651 A.2d 944, 948 (1994); *Appeal of State of N.H.*, 138 N.H. 716, 723, 647 A.2d 1302, 1307 (1994). Accordingly, a unilateral change in the former is an unlawful refusal to engage in required negotiation, *see Labor Board v. Katz*, 369 U.S. 736, 747 (1962), but a unilateral change in the latter is generally a legitimate exercise of discretion, *see Appeal of Internat'l Assoc. of Firefighters*, 123 N.H. 404, 408, 462 A.2d 98, 101 (1983). *See generally* H. EDWARDS ET AL., LABOR RELATIONS IN THE PUBLIC SECTOR 303 n.5, 405 (2d ed. 1979).

In this case, the parties agree that the city's reorganization of its custodial staff was a unilateral change following expiration of the CBA. The parties disagree, however, on whether the city had a duty to negotiate with the union concerning the reorganization. Their dispute centers on the "managerial policy exception," which is contained within the statutory definition of "terms and conditions of employment." RSA 273-A:1, XI provides:

> "Terms and conditions of employment" means wages, hours and other conditions of employment other than managerial policy within the exclusive prerogative of the public employer, or confided exclusively to the public employer by statute or regulations adopted pursuant to statute. The phrase "managerial policy within the exclusive prerogative of the public employer" shall be construed to include but shall not be limited to the functions, programs and methods of the public employer, including the use of technology, the public employer's organizational structure, and the selection, direction and number of its personnel, so as to continue public control of governmental functions.

The union essentially contends that the lay-off in combination with the hiring of part-time personnel does not fall within the managerial policy exception and therefore was a mandatory subject of bargaining. The city, in contrast, argues that its reorganization fits squarely within this exception and therefore was not a required topic of negotiation.

We have articulated a three-step analysis for measuring a particular proposal or action against the managerial policy exception. "First, to be negotiable, the subject matter of the proposed

contract provision must not be reserved to the exclusive managerial authority of the public employer by the constitution, or by statute or statutorily adopted regulation." *Appeal of State of N.H.*, 138 N.H. at 722, 647 A.2d at 1306. "Second, the proposal must primarily affect the terms and conditions of employment, rather than matters of broad managerial policy." *Id.* "Third, if the proposal were incorporated into a negotiated agreement, neither the resulting contract provision nor the applicable grievance process may interfere with public control of governmental functions contrary to the provisions of RSA 273-A:1, XI." *Id.*, 647 A.2d at 1307.

A proposal that fails to satisfy the first step is a *prohibited* subject of bargaining. *Id.* at 723, 647 A.2d at 1307. A proposal that satisfies step one, but that fails either step two or step three, is a *permissible* topic of negotiations. *Id.; see also Appeal of City of Concord*, 139 N.H. at 282-83, 651 A.2d at 948. A proposal that satisfies all three steps is a *mandatory* subject of collective bargaining. *Appeal of State of N.H.*; 138 N.H. at 723, 647 A.2d at 1307.

■ Applying the three-step inquiry to the facts of this case, we hold that the city's reorganization was a mandatory subject of collective bargaining. First, the parties cite no *independent* statute, or any constitutional provision or valid regulation, that reserves to the city the exclusive authority to lay-off full-time employees and replace them with part-time employees. We reject the city's bootstrapping attempt to utilize the statutory managerial policy exception as the statute that determines the scope and applicability of the managerial policy exception. *See id.* at 721-23, 647 A.2d at 1306-07.

Second, the city's reorganization primarily affects the wages and hours of employees, rather than issues of broad managerial policy. We recognize that in many cases, like the present one, a proposal or action will touch on significant interests of *both* the public employer and the employees. In such instances, the second part of the inquiry cannot be resolved through simple labels offered by management, such as "restructuring" or "personnel reorganization," or through conclusory descriptions urged by employees, such as "inherently destructive" conduct. Rather, "[d]etermining the primary effect of the proposal requires an evaluation of the strength and focus of the competing interests." *Id.* at 722, 647 A.2d at 1307.

Reduced to its essence, the reorganization in this case replaced certain employees who worked forty hours per week at over nine dollars per hour with a *greater* number of employees who work twenty hours per week at seven dollars per hour. Under the reorganization, the actual job duties remained the same. Although

our historical approach to the managerial policy exception may have necessitated the clarification recently provided by *Appeal of State of New Hampshire*, 138 N.H. at 720, 647 A.2d at 1305, our cases have consistently recognized proposals and actions that primarily affect wages or hours as mandatory subjects of bargaining. *See Appeal of Franklin Education Assoc.*, 136 N.H. 332, 335, 616 A.2d 919, 921 (1992); *Appeal of White Mts. Regional School Bd.*, 125 N.H. 790, 793, 485 A.2d 1042, 1046 (1984); *Appeal of Berlin Educ. Ass'n*, 125 N.H. 779, 783-84, 485 A.2d 1038, 1041 (1984); *State Empl. Ass'n v. Board of Trustees*, 118 N.H. 466, 467-68, 388 A.2d 203, 204-05 (1978). For example, even though a school board's authority to decide whether to offer extracurricular programs or to determine the number of such programs implicates broad managerial policy, the wages and hours for staff involved in any extracurricular programs constitute mandatory subjects of bargaining. *See Appeal of Berlin Educ. Ass'n*, 125 N.H. at 783-84, 485 A.2d at 1041-42; *see also Appeal of State of N.H.*, 138 N.H. at 722, 647 A.2d at 1306-07. Accordingly, a public employer's "greater" power to create or eliminate a position or program does not necessarily include the "lesser" power to unilaterally determine wages and hours for the position or program. *Cf. Appeal of Internat'l Assoc. of Firefighters*, 123 N.H. at 406-09, 462 A.2d at 100-01 (public employer that unilaterally reduced platoon sizes from six firefighters to five, but that otherwise maintained existing wage and benefit levels, committed no unfair labor practice); *Appeal of Keene State College Educ. Ass'n*, 120 N.H. 32, 37-38, 411 A.2d 156, 160-61 (1980) (public employer's elimination of certain faculty committees and chairmanships in its "management structure" not an unfair labor practice, but employer still obligated to negotiate faculty wages and hours).

On the third prong of the test, we conclude that limiting the city's ability to reorganize in the specific manner utilized here would not interfere with public control of governmental functions. Preventing the city from unilaterally replacing full-time custodians with lower-paid part-time employees — to perform the *identical* job functions — does not present the type of problem we have identified in this context: hindering or impeding a public employer's authority to establish policy, standards, or criteria for disciplinary action. *See Appeal of State of N.H.*, 138 N.H. at 723-24, 647 A.2d at 1307-08; *see also Appeal of City of Concord*, 139 N.H. at 282-83, 651 A.2d at 948. Finally, we note that an overly expansive view of the proposals or actions that "interfere with public control of governmental functions" could embrace *any* term of employment, thereby eliminating the category of mandatory subjects and thwarting the collective

bargaining process required by RSA chapter 273-A. *Cf.* Befort, *Public Sector Bargaining: Fiscal Crisis and Unilateral Change*, 69 MINN. L. REV. 1221, 1274 (1985) (criticizing the view that "public sector bargaining is an aberration that need be tolerated only when convenient").

Because the city's reorganization during the status quo period constituted a unilateral change on mandatory subjects of bargaining, the city committed an unfair labor practice. The city argues, however, that the expired CBA, and therefore the status quo itself, authorized the city's actions in that the "management rights" article of the CBA granted authority for the reorganization. Even assuming the city's legal analysis of the status quo is correct, we disagree with its interpretation of the "management rights" article. That article merely reserved to the city control over certain issues that were not specifically addressed in the CBA, and the CBA specifically provided for the wages and hours of the employees. Since the primary effect of the reorganization was a wholesale change in the bargained-for wages and hours of employees, the "management rights" article of the CBA provides no refuge. *See Appeal of White Mts. Regional School Bd.*, 125 N.H. at 793-94, 485 A.2d at 1045-46. Accordingly, we affirm the PELRB's conclusion that the city's reorganization constituted an unfair labor practice.

We address the city's remaining two arguments together. The city contends that the PELRB's remedy for the unfair labor practice impermissibly extends to persons beyond the PELRB's jurisdiction and defies implementation as a result of its vagueness. Although the PELRB's reasoning focused on those former full-time custodians that were hired as part-time custodians, the PELRB ordered the city to compensate "[t]he position of part-time custodian" at the hourly wage rates for full-time custodians and to provide other benefits on a pro rata basis. The city argues that the order fails to specify whether it applies *only* to those former full-time employees that are now part-time employees or, instead, to *all* current part-time custodians. If the latter, the city asserts that the PELRB's remedy erroneously grants CBA benefits to employees who are not appropriately classified as bargaining unit members. The union interprets the PELRB's remedy as extending only to the "part-time custodians who were former full-time custodians and bargaining unit members." Based on the union's interpretation, we find no error since the PELRB is authorized to "order such . . . relief as [it] may deem necessary," RSA 273-A:6, VI (Supp. 1996), and the remedy here is compatible with the violation. We further reject the city's argument that the PELRB's remedy for the

violation of the status quo amounts to a "cost item," *see* RSA 273-A:I, IV (1987), requiring approval by the local legislative body. *See Appeal of Alton School Dist.*, 140 N.H. at 311, 315, 666 A.2d at 942, 945.

Finally, we reiterate that parties to a CBA have the ability to avoid the consequences of the status quo. *See id.* at 316, 666 A.2d at 945. Furthermore, terms and conditions of employment imposed as a result of the status quo doctrine do not become fixed forever; they only last during the process of good faith collective bargaining whose protection and advancement is the rationale for the status quo doctrine. *See Appeal of Milton School Dist.*, 137 N.H. at 247, 625 A.2d at 1061.

*Affirmed.*

All concurred.