NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

———————————————

Public Employee Labor Relations Board
No. 2013-506

APPEAL OF STRAFFORD COUNTY SHERIFF'S OFFICE & a.
(New Hampshire Public Employee Labor Relations Board)

Argued: September 11, 2014
Opinion Issued: November 13, 2014

Soldati Law Offices, P.A., of Portsmouth (Lincoln T. Soldati on the brief and orally), for the petitioners.

Nolan Perroni Harrington, LLP, of Lowell, Massachusetts (Peter J. Perroni on the brief and orally), for the respondent.

LYNN, J. The petitioners, the Strafford County Sheriff's Office and the Strafford County Board of Commissioners (collectively, the county), appeal an order of the New Hampshire Public Employee Labor Relations Board (PELRB), which found that the county committed an unfair labor practice by changing the terms and conditions of employment of Sheriff's Office employees during the period when the respondent, the New England Police Benevolent Association, Local 295 (union), was seeking certification of a bargaining unit that included those employees. We affirm.

I

The following facts were found by the PELRB or are supported by the record. The county is a public employer. See RSA 273-A:1, X (2010). On July

13, 2012, the union filed a petition for certification with the PELRB, seeking approval of a bargaining unit comprised of certain employees of the Sheriff's Office. The PELRB subsequently approved a bargaining unit composed of the positions of deputy sheriff, dispatcher, and secretary. Following an election in December 2012, the union was certified as the bargaining unit's exclusive representative.

As of July 13, 2012, Paul Rowe and Michael Lemoi were employed as deputies in the civil department of the Sheriff's Office. They both worked a schedule of four ten-hour days per week (4-10 schedule). Pursuant to contractual arrangements between the Sheriff's Office and the United States Immigration and Customs Enforcement (ICE), Rowe and Lemoi, as well as other deputies, also performed work for ICE, such as transporting detainees involved in ICE proceedings.

By September 2012, the county decided to establish two new full-time deputy positions dedicated to ICE work. The then-sheriff, Wayne Estes, discussed the new ICE positions with Rowe and Lemoi. Both deputies expressed interest in the positions, but only if their ICE work schedules consisted of five eight-hour work days per week (5-8 schedule). They sought 5-8 schedules for the ICE positions in order to maximize their potential for overtime earnings. However, both deputies preferred 4-10 schedules if they continued to work in the civil department, and neither deputy asked to have his civil department schedule changed to a 5-8 schedule.

In October 2012, the sheriff proposed a schedule for the new ICE positions, which called for Rowe and Lemoi to work 4-10 schedules. Lemoi responded by e-mail and requested the 5-8 schedule that he believed had been previously agreed upon. He also requested to stay in the civil department if the 5-8 schedules would not be implemented for the ICE positions. In response, the sheriff notified Rowe and Lemoi that they would remain in the civil department, but that their work hours were being changed from 4-10 schedules to 5-8 schedules.

Deputy sheriffs also sometimes perform "outside detail" work. This work consists of providing law enforcement services to third parties, such as local police departments, which have need for extra personnel at certain times.[1] The county bills the third parties who engage deputies to perform outside detail work and then compensates the deputies by paying them a portion of the funds it receives. Although outside detail work is not part of a deputy's normal work day or schedule, prior to the time the union sought certification, the county paid deputies for outside detail work at a rate equal to their overtime

---

[1] For example, deputies have regularly worked outside details for the Durham Police Department during the University of New Hampshire's yearly homecoming weekend.

compensation rate, regardless of whether they were otherwise eligible for overtime compensation.

Prior to the union's certification petition, the county also permitted deputies to include benefit time, such as holiday, vacation, and sick leave, in their hour totals for determining their eligibility for overtime pay for work in excess of 40 hours per week.

In the summer of 2012, the United States Department of Labor (DOL) completed an investigation into possible violations of the federal Fair Labor Standards Act (FLSA) by the Sheriff's Office, based on its wage and hour practices during the previous two years. The DOL investigator summarized his findings in a letter to the county, which stated in part:

> The investigation found violations of FLSA section 7 resulting from your failure to pay statutory overtime pay for hours worked in excess of 40 per week. Specifically, you failed to include federal [ICE] hours into the total work hours of non-exempt employees when computing overtime pay for hours worked in excess of 40 per week. As a result, the employees were paid at their regular hourly rate of pay with no additional half-time premium for hours worked in excess of 40 per week.
>
> The investigation further found violations of FLSA section 11 resulting from your failure to keep an accurate record of all hours worked for non-exempt employees. Specifically, you failed to retain an accurate record of hours worked per day and per week by all non-exempt employees for 2010.
>
> As a result of these violations, five employees were found due back wages totaling $4,812.17.

After the union filed its certification petition on July 13, 2012, the county discontinued both established practices of paying the overtime rate for outside detail work regardless of the number of hours worked, and of including benefit time when computing hours worked for purposes of overtime compensation.

In November 2012, the union filed a complaint with the PELRB, alleging that the county committed an unfair labor practice, in violation of RSA 273-A:5, I(a), (b), (c), and (g), by changing the terms and conditions of employment of proposed bargaining unit members after the union petitioned to act as the unit's exclusive representative for purposes of collective bargaining. Following a hearing, the PELRB determined that the county "committed an unfair labor practice because it failed to maintain the status quo during the pendency of bargaining unit formation and representation election proceedings." The PELRB decided that the three changes made – to the deputies' schedules, to

3

the rate of pay for outside detail work, and to the manner in which overtime was calculated – were all mandatory subjects of bargaining that the county could not unilaterally change once the union filed its certification petition.  The PELRB ordered the county to "restore the affected employees to the status quo ante that existed as of the filing of the certification petition and make them whole."  The PELRB denied the county's motion for rehearing, and this appeal followed.

II

RSA chapter 541 governs our review of PELRB decisions.  See RSA 273-A:14 (2010); RSA 541:2 (2007).  We will not set aside the PELRB's order except for errors of law, unless we are satisfied, by a clear preponderance of the evidence, that it is unjust or unreasonable.  RSA 541:13 (2007).  The PELRB's findings of fact are presumed prima facie lawful and reasonable.  Id.  In reviewing the PELRB's findings, "our task is not to determine whether we would have found differently than did the [PELRB], or to reweigh the evidence, but rather to determine whether the findings are supported by competent evidence in the record."  Appeal of Dean Foods, 158 N.H. 467, 474 (2009) (quotation omitted).  We review the PELRB's rulings on issues of law de novo.  See Appeal of Portsmouth Regional Hosp., 148 N.H. 55, 57 (2002).

III

The county first contends that it did not violate the status quo doctrine when the sheriff changed Rowe's and Lemoi's work schedules.  It argues that the status quo was that the sheriff retained the prerogative to determine deputies' work schedules; therefore, when the sheriff altered the schedules, there was no change in the status quo and, accordingly, no unfair labor practice.  We disagree.

"Maintenance of the status quo demands that all terms and conditions of employment remain the same during collective bargaining."  Appeal of City of Nashua Bd. of Educ., 141 N.H. 768, 772 (1997) (quotation omitted).  "We have explained that the status quo doctrine derives from RSA 273-A:3, I, which imposes the obligation to negotiate in good faith over the terms of employment, and from RSA 273-A:5, . . . which makes it an unfair labor practice for a public employer to refuse to negotiate in good faith."  Id.  A public employer's "unilateral change in a term or condition of employment[,] whether during negotiations for an initial [collective bargaining agreement] or during a status quo period following expiration of a CBA[,] is tantamount to a refusal to negotiate that term and destroys the level playing field necessary for productive and fair labor negotiations."  Id. (emphasis added; quotation and parentheses omitted).  However, "the status quo doctrine is limited by its rationale.  Thus, an employer is prohibited from making unilateral changes on mandatory subjects of collective bargaining, but not on permissive topics of collective

4

bargaining." Id. at 772-73. "[A] unilateral change in the former is an unlawful refusal to engage in required negotiation, but a unilateral change in the latter is generally a legitimate exercise of discretion." Id. at 773 (citation omitted).

RSA 273-A:1, XI (Supp. 2013) defines the "'[t]erms and conditions of employment'" as:

> [W]ages, hours and other conditions of employment other than managerial policy within the exclusive prerogative of the public employer, or confided exclusively to the public employer by statute or regulations adopted pursuant to statute. The phrase "managerial policy within the exclusive prerogative of the public employer" shall be construed to include but shall not be limited to the functions, programs and methods of the public employer, including the use of technology, the public employer's organizational structure, and the selection, direction and number of its personnel, so as to continue public control of governmental functions.

To determine whether the county had a managerial prerogative to change the deputies' work schedules, we apply a "three-step analysis for measuring a particular proposal or action against the managerial policy exception." Appeal of City of Nashua Bd. of Educ., 141 N.H. at 773. "First, to be negotiable, the subject matter of the proposed contract provision must not be reserved to the exclusive managerial authority of the public employer by the constitution, or by statute or statutorily adopted regulation." Id. at 773-74 (quotation omitted). "Second, the proposal must primarily affect the terms and conditions of employment, rather than matters of broad managerial policy." Id. at 774 (quotation omitted). "Third, if the proposal were incorporated into a negotiated agreement, neither the resulting contract provision nor the applicable grievance process may interfere with public control of governmental functions contrary to the provisions of RSA 273-A:1, XI." Id. (quotation omitted).

Applying this three-step analysis to the present case, we conclude that the deputies' scheduling was a mandatory subject of bargaining that the county could not unilaterally change after the union filed its petition. See id. at 772 (noting that a public employer's "unilateral change in a term or condition of employment . . . during negotiations for an initial CBA . . . is tantamount to a refusal to negotiate that term and destroys the level playing field necessary for productive and fair labor negotiations" (emphasis added; quotation omitted)); see also Piggly Wiggly, Tuscaloosa Div., Etc. v. N.L.R.B., 705 F.2d 1537, 1538-39 (11th Cir. 1983) (describing the "'critical period'" during which unfair labor practices may occur under the National Labor Relations Act as beginning "when a representation petition is filed").

First, the parties here fail to identify any "independent statute, or any constitutional provision or valid regulation, that reserves to the [county] the

5

exclusive authority" to alter the deputies' work schedules. Appeal of City of Nashua Bd. of Educ., 141 N.H. at 774. Instead, the county refers to the deputies' hiring letters and a "specifically designated policy of the Sheriff's department" that allegedly reserved for the sheriff the "exclusive right to set work schedules of deputies." Even assuming that this policy was in place, the county fails to argue, or present any evidence, that such a policy was codified in any constitution, statute, or regulation. See id. Therefore, we proceed to the second step in the analysis.

We also conclude that the change in schedules "primarily affect[s] the terms and conditions of employment, rather than matters of broad managerial policy." Id. As previously noted, RSA 273-A:1, XI defines the terms and conditions of employment to specifically include "wages, hours and other conditions of employment." (Emphasis added.) "[O]ur cases have consistently recognized proposals and actions that primarily affect wages or hours as mandatory subjects of bargaining." Appeal of City of Nashua Bd. of Educ., 141 N.H. at 775 (emphasis added). Additionally, "a public employer's 'greater' power to create or eliminate a position or program does not necessarily include the 'lesser' power to unilaterally determine wages and hours for the position or program." Id. Thus, the change in Rowe's and Lemoi's hours of work in the civil department from 4-10 to 5-8 schedules primarily affected the terms and conditions of the deputies' employment. See id.

Finally, we "conclude that if this proposal were incorporated into a negotiated agreement, the resulting contract provision would not interfere with public control of governmental functions." Appeal of Town of North Hampton, 166 N.H. ___, ___, 93 A.3d 299, 303 (2014). Preventing the county from unilaterally altering the deputies' schedules after the union's petition was filed "does not present the type of problem we have identified in this context: hindering or impeding a public employer's authority to establish policy, standards, or criteria for disciplinary action." Appeal of City of Nashua Bd. of Educ., 141 N.H. at 775; see Appeal of White Mts. Regional School Bd., 125 N.H. 790, 794 (1984) (noting that a "unilateral action to change hours of work" is "forbid[den]"). Because the changes in the deputies' schedules satisfy all three steps of the analysis, the changes are mandatory subjects of collective bargaining. See Appeal of City of Nashua Bd. of Educ., 141 N.H. at 774.

Nonetheless, the county argues that the sheriff did not violate the status quo doctrine by changing the work schedules of Rowe and Lemoi subsequent to the filing of the union's petition because the sheriff had exercised the authority to establish and change work schedules before the petition was filed. Although the letters by which Rowe and Lemoi were originally offered employment stated that "[t]he Sheriff reserves the right to adjust working hours," the evidence before the PELRB concerning the manner in which the sheriff actually exercised his scheduling authority prior to the filing of the petition was conflicting, and supports the PELRB's finding that the sheriff "was indifferent

6

to whether the Deputies worked a 5-8 or a 4-10 schedule." In these circumstances, we cannot say that the PELRB's determination that the county violated the status quo doctrine, and thereby committed an unfair labor practice, by unilaterally altering the deputies' schedules, over their objection, following the filing of the union's petition was unsupported by the evidence or legally erroneous.[2] See id. at 774-76. Therefore, the PELRB's decision on this point is affirmed.

IV

Turning to the changes to the pay rate for the outside detail work and the way in which overtime was calculated, the union correctly notes that the county does not argue on appeal that these two changes did not involve mandatory subjects of bargaining. Therefore, any claim of error predicated on this ground is waived. See Aubert v. Aubert, 129 N.H. 422, 428 (1987) ("Arguments not briefed are waived on appeal."). Accordingly, we cannot conclude that the PELRB erred in determining that the county committed an unfair labor practice by violating the status quo when it made these two unilateral changes after the union filed its certification petition.

Nevertheless, the county maintains that it was justified in making these two changes because of the DOL investigation. It contends that it had "no choice but to comply with" what it "understood to be mandated" by the DOL, and, thus, that it changed these practices to avoid possible future fines and penalties that could have been imposed by the DOL.

We are not persuaded. Even assuming that the county actually made the changes in response to the DOL investigation, "the FLSA sets only minimum standards, a floor, not the maximum amount an employer may agree to pay." U.S. Dept. of Air Force v. F.L.R.A., 952 F.2d 446, 455 (D.C. Cir. 1991) (Randolph, J., dissenting); see also Rogers v. City of Troy, New York, 148 F.3d 52, 57 (2d Cir. 1998) ("The FLSA sets a national 'floor' in terms of working conditions, in order to protect workers from the substandard wages and excessive hours that might otherwise result from the free market. Parties may, of course, contract for additional rights above those guaranteed by the statute."). Apart from its apparent misunderstanding, then, nothing prevented

---

[2] To the extent that the county invites us to adopt the reasoning and outcome of Marion Cty. Law Enf. Assn. v. Marion Cty., 883 P.2d 222 (Or. Ct. App. 1994), we decline the invitation. That case involved a collective bargaining agreement that explicitly provided the employer with the "discretion to change the work schedule" of the employees as necessary. Marion Cty. Law Enf. Assn., 883 P.2d at 225. Since that written agreement was the "basis for determining the status quo," when the employer changed the employees' schedules pursuant to that agreement, the court concluded that "there was no change in the status quo and, hence, no unfair labor practice." Id. Here, however, there was no explicit written collective bargaining agreement (expired or otherwise) that reserved to the sheriff the right to set work schedules. Thus, this case and Marion Cty. are readily distinguishable.

the county from continuing to pay the increased outside detail wage and continuing to include benefit time when computing overtime wages, as these were simply wages and benefits greater than what the FLSA required. Therefore, we conclude that the county has not met its burden of demonstrating that the PELRB erred in finding that these changes constituted an unfair labor practice. See RSA 541:13.

The county also asserts that the PELRB erred by failing to properly account for county policy regarding overtime calculations. It maintains that the county "had a countywide overtime policy that was part of its Employee Manual" and that the DOL investigation "brought to light the conflict between the Sheriff's department and all other county employees . . . with respect to the calculation of overtime." At bottom, the county contends that, because the way the sheriff had been calculating overtime prior to the filing of the union's petition violated county policy, the status quo doctrine should not require it to continue to violate that policy.

We decline to consider this argument. "It is the burden of the appealing party, here the [county], to provide this court with a record sufficient to decide [its] issues on appeal." Bean v. Red Oak Prop. Mgmt., 151 N.H. 248, 250 (2004). However, in its briefs, the county fails to cite any evidence in the record to support its contention that such a county policy existed. And although the county referenced a portion of its alleged policy in its motion for rehearing filed with the PELRB, it acknowledged in that motion that "[a]dditional testimony and exhibits are necessary to clarify the existing personnel policies (status quo) of the County and the corresponding authority and responsibilities of the Board of County Commissioners vis-à-vis the Sheriff with respect to establishing and implementing personnel policies." In essence, the county's motion asked the PELRB to permit it to reopen the hearing and allow it to present additional evidence, without making any showing as to why such evidence could not have been presented at the original hearing. The PELRB was under no obligation to grant such a request, and the county has not demonstrated that the board unsustainably exercised its discretion in failing to do so. Cf. Brown v. John Hancock Mut. Life Ins. Co., 131 N.H. 485, 492 (1989).

V

Finally, the county notes that the PELRB made no finding of retaliation or improper motive by the sheriff in changing the deputies' schedules, the pay rate for the outside detail work, and the manner in which overtime compensation was calculated. The county argues that such a finding is a necessary prerequisite to an unfair labor practice. In support of its position, the county cites Hudon v. City of Manchester, 141 N.H. 420, 424 (1996) ("We have recognized that a claim under RSA 273-A:5 requires evidence of a retaliatory or discriminatory motive on the part of the public employer.");

8

Appeal of Sullivan County, 141 N.H. 82, 88-89 (1996) (stating that "the union must prove some minimal degree of illegal motivation on the part of the employer to commit an unfair labor practice before the PELRB can find that RSA 273-A:5, I(a) or (b) has been violated"); and Appeal of Prof. Firefighters of E. Derry, 138 N.H. 142, 145 (1993) (noting that to establish an unfair labor practice under RSA 273-A:5, one "must prove by a preponderance of the evidence some element of retaliatory action"). These cases are easily distinguishable from this case, however, because none of them involved an employer making a unilateral change to the terms and conditions of employment after a petition for certification of a bargaining unit had been filed with the PELRB, as occurred here.[3]

Additionally, in our recent decision in Appeal of Town of North Hampton, we concluded that "a finding of anti-union animus was not necessary" for the PELRB to determine that the public employer "committed an unfair labor practice by unilaterally setting the wage and other conditions of employment." Appeal of Town of North Hampton, 166 N.H. at ___, 93 A.3d at 305. In that case, we reasoned that a "unilateral change in a condition of employment is equivalent to a refusal to negotiate that term and destroys the level playing field necessary for productive and fair labor negotiations." Id. (quotation omitted). For the same reason, we reject the county's argument here that the PELRB erred in finding an unfair labor practice without making findings of retaliation or improper motive on the part of the county. See id.

Affirmed.

DALIANIS, C.J., and HICKS, CONBOY, and BASSETT, JJ., concurred.

---

[3] As the union correctly observes, in Appeal of Sullivan County, the employer both decided to make the changes at issue and provided notice of its decision to do so to prospective bargaining unit members before the filing of the petition for certification. See Appeal of Sullivan County, 141 N.H. at 88.