Public Employee Labor Relations Board
No. 2005-386

APPEAL OF NEW HAMPSHIRE DEPARTMENT OF SAFETY
(New Hampshire Public Employee Labor Relations Board)

Argued: November 8, 2006
Opinion Issued: April 17, 2007

*Kelly A. Ayotte*, attorney general (*Nancy J. Smith*, senior assistant attorney general, on the brief and orally), for the petitioner.

*Donchess & Notinger, P.C.*, of Nashua (*James W. Donchess* on the brief and orally), for the respondent.

BRODERICK, C.J. The petitioner, the New Hampshire Department of Safety, Division of State Police (Division), appeals a decision of the New Hampshire Public Employee Labor Relations Board (Board) that the Division breached the 2001-2003 collective bargaining agreement (CBA) with the respondent, the New Hampshire Troopers Association (Association), thus committing an unfair labor practice in violation of RSA 273-A:5, I(h) (1999). We affirm.

The record supports the following. The Association, formed in 1997, is the certified exclusive bargaining representative for sworn personnel employed by the Division, up to and including the grade of sergeant. The Division and the Association have been parties to collective bargaining agreements, separate from those covering other state employees, for the periods 1997-1999 and 1999-2001. They are also parties to the latest CBA, which became effective in 2001.

On July 1, 2004, the Division made a unilateral change to its annual and sick leave calculation practices. As a result, some Division employees experienced a reduction in the number of annual/sick leave days available from their accumulated leave totals. The Association filed a complaint with

the Board, alleging an unfair labor practice violation under RSA 273-A:5, I(h). The Association contended that the amount, accumulation and utilization of annual/sick leave days had been agreed to by the parties during negotiations of the most recent CBA and were not subject to such unilateral change.

Subsequent to an evidentiary hearing, the Board issued an order, declaring that it had:

> examined the language used by the parties in their [CBA] and determined that it is ambiguous or that the parties' actions evidence their acceptance of a practice not specifically expressed in the CBA. The Board has determined that a *bona fide* past practice developed between the parties and that that practice established a term or condition of work. Since we find the condition that has provided a benefit to the [state] troopers for many years to be subject to good faith negotiations, the Division could not modify the practice unilaterally without first negotiating with the Association. We therefore find that the Division breached its agreement with the Association and committed an improper labor practice beginning on July 1, 2004 through its failure to maintain the *status quo* and failure to negotiate a modification to the leave deduction policy prior to its implementation, especially during a *status quo* period between the parties . . . .

Further, the Board ordered the Division to restore accumulated annual and sick leave to those members of the Association affected by the change in calculation procedures, cease and desist from future leave deductions based upon the changed procedures, and return to the status quo as it existed before July 1, 2004. The Board denied the Division's motion for rehearing; this appeal followed.

The Division contends that the Board erred as a matter of law because it: (1) improperly applied the status quo doctrine; and (2) exceeded its authority by requiring the Division to continue an erroneous administrative practice inconsistent with the terms of the CBA. Further, it contends that the Board's decision is "manifestly unjust and unreasonable," as it enforces a past practice that provides unequal benefits to members of the same bargaining unit.

I

When reviewing a decision of the Board, we defer to its findings of fact, and, absent an erroneous ruling of law, we will not set aside its decision unless the appealing party demonstrates by a clear preponderance of the

evidence that the order is unjust or unreasonable. *Appeal of Nashua Police Comm'n,* 149 N.H. 688, 689 (2003); *see also* RSA 541:13 (1997). Our resolution of the dispute in this case requires that we interpret provisions of the CBA, and we begin by focusing upon the language used, as it reflects the parties' intent. *Nashua Police Comm'n,* 149 N.H. at 690.

> This intent is determined from the agreement taken as a whole, and by construing its terms according to the common meaning of their words and phrases. The interpretation of a collective bargaining agreement, including whether a provision or clause is ambiguous, is ultimately a question of law for this court to decide. A clause is ambiguous when the contracting parties reasonably differ as to its meaning.

*Id.* (quotations and citations omitted).

## II

We first address the Division's argument that the Board erred as a matter of law because it improperly applied the status quo doctrine in determining that a "past practice controlled over the explicit terms of the CBA." Specifically, the Division points to the presence of an "evergreen" provision and the absence of a status quo provision in the CBA as mandating a conclusion that application of the status quo doctrine was improper in this case. In that limited sense, we agree with the Division.

An automatic renewal, or "evergreen," clause "purports to continue the terms of the contract indefinitely until the parties negotiate, and the legislative body ratifies, a successor contract." *Appeal of Alton School Dist.,* 140 N.H. 303, 307 (1995).

> In the absence of a binding automatic renewal clause, a CBA ends on its termination date. Once a CBA expires, while the parties continue to negotiate for a successor agreement, their obligations to one another are governed by the doctrine of maintaining the status quo.

*Id.* Article 22.1 of the CBA, as noted in the Board's findings of fact, provides that "[t]his Agreement . . . shall remain in full force and effect through June 30, 2003, or until such time as a new Agreement is executed." Given the presence of this valid evergreen provision, the Board erred to whatever extent it applied the status quo doctrine.

Our holding, however, does not mandate a reversal of the Board's order, as argued by the Division. When the Board bases its decision upon mistaken grounds, we will sustain it if there are valid alternative grounds to support it. *See Appeal of City of Nashua Bd. of Educ.,* 141 N.H. 768, 772

(1997). The paramount issues in this case are the intent of the parties in agreeing to the terms of the CBA, and whether the Division's unilateral change in practices precipitated results contrary to that intent. If we find the latter to be true, we may affirm the Board's decision that the Division breached the CBA and committed an unfair labor practice. Here, in addition to finding that the Division committed an unfair labor practice by failing to maintain the status quo, the board determined that the language used by the parties in the CBA was ambiguous. The question of whether a provision or clause of a collective bargaining agreement is ambiguous is one of law for this court to decide. *See Duke/Fluor Daniel v. Hawkeye Funding*, 150 N.H. 581, 582 (2004) (we review trial court's interpretation of contract *de novo*). Consequently, we need not remand this case to the Board for further deliberation on this same issue.

## III

We next address whether the language in the CBA with regard to the manner of deducting annual and sick leave is ambiguous. The two provisions of the CBA at issue are "Article X Annual Leave" and "Article XI Sick Leave." The provisions read, in pertinent part:

10.1. Employees will be entitled to annual leave with full pay based on the formula given below. Each employee's entitlement shall be computed at the end of each completed month of service. Annual leave shall be cumulative for not more than the prescribed days and shall not lapse.

| Continuous Years Worked | Accrued/ Month | Years/Max. |
|---|---|---|
| 0 thru 1 | 1 day | 12 |
| 2 thru 5 | 1 ¼ days | 15/32 |
| 6 thru 10 | 1 ½ days | 18/38 |
| 11 thru 15 | 1 ¾ days | 21/44 |
| 15 plus | 2 days | 24/50 |

1 ¼ days = 10 hours; 1 ½ days = 12 hours
1 ¾ days = 14 hours; 2 days = 16 hours

. . . .

11.1. Full-time employees in the bargaining unit will be entitled to accrue sick leave in accordance with the formula given

below.... Sick leave shall be computed at the end of each completed month of service. Sick leave shall be cumulative for not more than the prescribed days and shall not lapse.

| Continuous Years Worked | Accrued/ Month | Years/Max. |
|---|---|---|
| 0 thru 8 | 1 ¼ days | 15/90 |
| 9 thru 15 | 1 ¼ days | 15/105 |
| 16 plus | 1 ¼ days | 15/120 |

1 ¼ days = 10 hours

. . . .

11.1.1. For purpose of utilization, sick leave shall be converted to hours.

For the Division's employees covered by the CBA, their work patterns divide them into two distinct groups. The first group is comprised mainly of detective troopers and administrative personnel. The group works eight-hour shifts for five days, followed by two days off, with four repetitions over a twenty-eight day cycle. The second group is comprised mainly of "road troopers," who work eight and one-half hour or nine-hour shifts for six days, followed by three days off, with approximately three repetitions over a twenty-eight day cycle. Both groups are scheduled to work 160 hours over the course of the standard twenty-eight day cycle. In calculating whether an employee had accrued the required 160 hours over the twenty-eight day cycle for pay purposes, the Division credited all troopers with the actual number of work hours in their scheduled shifts. Both before and after July 1, 2004, annual/sick leave was accumulated in eight-hour blocks.

Prior to July 1, 2004, the Division deducted a full day of leave from a trooper's accumulated leave total at a rate of eight hours for each day of annual or sick leave taken, regardless of whether the employee worked a shift of eight, eight and one-half, or nine hours, or longer. Beginning July 1, 2004, however, the Division deducted the actual number of hours in a particular trooper's shift from that trooper's accumulated leave totals for each day of annual or sick leave taken. For example, as of July 1, 2004, if a road trooper worked nine-hour shifts at the time of taking an annual leave day, the Division deducted nine hours of annual leave from the trooper's accumulated annual leave total.

As a result of the July 1, 2004 change in the calculation of leave utilization, the expected number of annual/sick leave days available to some troopers from their accumulated leave totals was reduced. In the case of experienced road troopers, this was at least a reduction from fifteen days of annual/sick leave to approximately twelve days per year.

In support of its contention that the terms of the CBA are "clear and unambiguous," the Division states that "Article 10.1 defines the accrual of annual leave in terms of days, but then specifically defines the days in terms of hours." Presumably, the Division would agree that the CBA provides for the following annual leave-accrual scenario: Trooper A, a road trooper with five years of continuous service, works nine-hour shifts for six days, and then has three days off work. Trooper B, a detective trooper with five years of continuous service, works eight-hour shifts for five days, and then has two days off work. Both troopers work 160 hours per twenty-eight day cycle. Pursuant to Article 10.1, both troopers earn 1¼ days leave per month and fifteen days per year. Using the "1 ¼ days = 10 hours" conversion factor from Article 10.1, the fifteen days earned annual leave for both troopers is equal to 120 hours.

With reference to the previous scenario, *deducting* the actual number of hours in a particular trooper's shift from that trooper's earned leave total for each day of annual leave taken produces disparate results. Pursuant to the Division's July 1, 2004 directive, Trooper A's 120 hours of annual leave are deducted at a rate of nine hours per leave day; Trooper B's 120 hours are deducted at a rate of eight hours per leave day. From the perspective of leave utilization, Trooper A has earned and has available approximately thirteen and one-third "days" of leave, but Trooper B has earned and has available fifteen "days" of leave. This scenario and its attendant numbers appear to be incongruous with Article 10.1's definition that "1 ¼ days = 10 hours" (or, consequently, 1 day = 8 hours), especially as it is unclear if the definitional phrase applies only to leave accrual, leave utilization, or both.

The scenario directly contradicts the Division's contention at oral argument that the CBA is *clear* that time is calculated "hour for hour" and also appears to be incongruous with Article 10.1's provision for a fifteen-day earned annual leave total. The latter is particularly apparent in light of Article 10.1's use of the terms "entitled" and "entitlement" ("Employees will be entitled to annual leave ... based on the formula given below. Each employee's entitlement shall be computed at the end of each completed month of service."). The common meaning of "entitled" includes "to give a right or legal title to : qualify (one) for something : furnish with proper grounds for seeking or claiming something." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 758 (unabridged ed. 2002). The common meaning of "entitlement" includes "the right to benefits ... : an allowance

... due to someone." *Id.*; *see also* BLACK'S LAW DICTIONARY 573 (8th ed. 1999) ("An absolute right to a ... benefit, ... granted immediately upon meeting a requirement"). Article 10.1's provision for an entitlement to fifteen "days" of annual leave appears meaningless if the utilization rate renders that leave to be something less.

While the terms of Article 10.1 may be clear in indicating that all troopers earn leave at the same rate, those same terms fail to detail unambiguously a different utilization rate for different troopers, as implemented by the Division. Article 11.1.1 does provide slightly more detail regarding the utilization of sick leave ("For purpose of utilization, sick leave shall be converted to hours.") Even that provision, however, does not unambiguously detail an agreed upon *rate* of utilization. Although the parties agree that fifteen days of earned sick leave is converted to 120 hours for all troopers, the CBA does not unambiguously detail whether those hours are to be utilized as "sick leave hour for work hour," or "eight hours per 'day'" (as implied by the "1 ¼ days = 10 hours" definition of Article 11.1).

With regard to the utilization of leave, the ambiguous nature of Article 10.1 is further highlighted when juxtaposed with Article 11.1.1. Prior to the 1997-1999 collective bargaining agreement, Article 10.1.2 had provided: "**Accounting**: For purposes of utilization, leave time shall be converted to hours"). This provision was deleted with the adoption of the 1997-1999 collective bargaining agreement. The supposed consequent silence of Article 10.1 with regard to the rate of leave utilization allows "entitled," "entitlement," and the definitional phrases to be read as applicable to either leave accrual only or to both leave accrual and utilization. We agree with the Board that:

> Such a specific provision in one article and not the other, that referring to annual leave, allows, we think, reasonable people to believe that the parties did not intend that both sick leave utilization and annual leave utilization be treated in the same manner. However, the parties have stipulated that in practice they were.

The Division contends that "[t]o the extent the CBA is silent on utilization of annual leave, the state personnel rules apply and require that annual leave be utilized in hours," citing N.H. ADMIN. RULES, Per 1203.01(c). The version of Per 1203.01(c) in the Division's appendix to its appeal states: "Employees shall request leave time in hours and appointing authorities shall keep all records of usage in hours according to the equivalencies listed in Table 3." In addition to listing a set of equivalencies for employees who work a thirty-seven and one-half hour

week, Table 3 contains a second set of equivalencies for "[a]ll [o]ther [e]mployees." Assuming, without deciding, that the CBA is silent and the latter equivalencies apply to all Division personnel, the equivalencies are identical to those already found in Article 10.1 of the CBA ("1 ¼ days = 10 hours," etc.). Absent explicit language in Per 1203.01(c) regarding the rate of leave utilization per "day," we see nothing in the rule that eliminates the ambiguous nature of the CBA.

The Division contends that the pre-July 1, 2004 method of accruing and deducting leave "resulted in unequal treatment of employees in violation of the CBA, Article 1.5." Indeed, at oral argument, the Division acknowledged that it had committed an unfair labor practice by this continuing violation of Article 1.5. Article 1.5 provides that "[t]he provision[s] of this Agreement shall be applied equally to all employees in the bargaining unit in accordance with state and federal law." The Division's change in the method of deducting leave, however, results in an equivalent level of unequal treatment of employees and simply underscores the ambiguous nature of Article 10.1.

The Board determined that the language used by the parties is ambiguous. A contractual provision is ambiguous when the contracting parties reasonably differ as to its meaning. *See Nashua Police Comm'n,* 149 N.H. at 690. Here, the Division and the Association clearly differ as to the meaning of the provisions. For all of the reasons noted, we believe that disagreement to be wholly reasonable, and we agree with the Board's finding of ambiguity.

## IV

Having found that the language used by the parties in the CBA with regard to the manner of calculating annual and sick leave is inherently ambiguous, we need not address the Division's contention, premised upon the assumption of non-ambiguous language, that the Board exceeded its authority. Nor do we need to address the Division's contention that the Board erred by going outside the language of the CBA and considering past practice and extrinsic evidence to *introduce* an ambiguity.

■ In addition to determining that the language used by the parties in the CBA was ambiguous, the Board also determined that the parties' actions evidenced their acceptance of a practice not specifically expressed in the CBA. Accordingly, the Board was justified in examining the parties' past practices and other extrinsic evidence to discern the intent of the parties. *Wheeler v. Nurse,* 20 N.H. 220, 221 (1849) ("There are cases where usage may be received to aid in the construction of a contract; but this is only where there is an ambiguity or uncertainty in the contract itself, or

where the evidence relates to some incidents as to which the contract is entirely silent."). If we find that the Division's unilateral change in practices precipitated results contrary to that intent, we may affirm the decision of the Board that the Division breached the CBA and committed an unfair labor practice.

In reviewing the Board's determinations, we do not engage in a *de novo* review of the evidence before the Board, but we require record support for its decisions. *See Appeal of Town of Newport*, 140 N.H. 343, 345 (1995); *see also Behrens v. S.P. Constr. Co.*, 153 N.H. 498, 500-01 (2006) ("Where . . . the terms of a contract are indeed ambiguous, and the fact finder has properly looked to extrinsic evidence to determine the intent of the parties, our standard of review is more deferential. We will sustain [its] findings and conclusions unless they are lacking in evidential support or tainted by error of law." (citation omitted)); *cf. Appeal of Town of Durham*, 149 N.H. 486, 488 (2003).

The Board's findings of fact included the following, stipulated by both parties: prior to July 1, 2004, in order to claim a full day of annual and/or sick leave, a trooper working a shift of more than eight hours completed an annual/sick leave request form and indicated eight hours of leave, completed a weekly duty report and indicated the actual number of hours on annual/sick leave for each day, and the Department of Safety, Division of Administration (Administration Division) deducted only eight hours of annual/sick leave from the trooper's earned leave time. The Board found that this was common practice "[f]rom at least 1997 and, more probably than not since 1986." The Board heard testimony that all levels of authority, including management and supervisory employees, administrative staff, and troopers were aware of the above methods of recording and calculating and that, in some instances, supervisors directly instructed new troopers as to how to reconcile the leave request forms with the weekly duty reports.

The Board heard further testimony indicating that, in some instances, supervising sergeants and lieutenants, who had access to both the request forms and weekly reports, would change or instruct administrative staff to change the hours reported, based upon previous experience that the trooper would be charged only for eight hours of leave. The Board found that "[a]t some time prior to 1997 and perhaps as early as 1986, troopers, troop secretaries, payroll clerks and other administrative staff were either instructed or allowed to deduct fewer hours of leave than a trooper taking that shift off may have been scheduled to work."

The Board found that as late as the negotiations period for the latest CBA, effective in 2001, neither the Association nor the Division suggested that the system was to be changed, nor did the Division indicate any intent

to do so. Colonel Frederick Booth, the Division's director, testified that the question of leave hour accrual and utilization first came to his attention in May 2003, that he requested clarification from the Administration Division, and that it was over one year later that the Administration Division issued a memorandum indicating that it would change the practice, effective July 1, 2004.

Our review of the record reveals that it supports the Board's findings and we agree with the Board's determination that:

> There is sufficient credible testimony to establish that over the course of the employment relationship between [the Association and the Division] and during negotiations over many years the troopers made their interest, concern and position obvious to the Division regarding the accumulation of leave time and how it would be deducted. The common reference utilized by the parties to confirm that the past practice was going to be adhered to in the future was the phrase "day for a day".... This term was raised in the context of negotiations and, while neither of the parties substituted or modified relevant express language in the parties' CBA's that would have clarified the practice, it continued openly. With this condition of work existing over such a substantial period of time, the affirmative actions taken of correcting reporting forms, the volume of occasions on which the calculations and leave time reductions were undertaken, and the widespread use and duration of reporting full shifts taken as leave of only eight (8) hours convince us that the course of dealings established a past practice. This past practice provided that regardless of the number of leave hours scheduled or reported to the Division by members taking a full shift or day off as annual or sick leave, that member was only charged with (8) hours of leave.
>
> ....
>
> The pervasive existence of this condition of work, the continuation of the practice for a year even following its alleged first discovery by a payroll clerk after many years of existence, and multiple agreements between the parties over that period of time lead us to the conclusion that both parties had knowledge that the practice existed and by their respective actions over the protracted period of time demonstrated acceptance of it.

V

The Division contends that the pre-July 1, 2004 leave calculation practices were "mistaken" and that "the CBA specifically provides that if either side is making a mistake in complying with the CBA, the existence of that error in the past does not constitute a waiver of the same subject in the future." In its brief and at oral argument, the Division invites us to follow the guidance of *Port Huron Education Ass'n v. Port Huron Area School District*, 550 N.W.2d 228 (Mich. 1996)—specifically, that when an employer mistakenly awards a benefit and then moves to rectify the mistake, the fact that the benefit was awarded, even for a lengthy period of time, does not bind the employer to continue awarding it:

> [T]he question presented is whether a past practice that is contrary to clear contract language can create a term or condition of employment. We hold that the unambiguous contract language controls unless the past practice is so widely acknowledged and mutually accepted that it amends the contract. The party seeking to supplant the contract language must show the parties had a meeting of the minds with respect to the new terms or conditions so that there was an agreement to modify the contract.

*Port Huron*, 550 N.W.2d at 232. As *Port Huron* is premised upon both unambiguous contract language and, as conceded by the Division, a subsequent mistake, we find it inapplicable here.

Even if we were to hold that the language of the CBA is unambiguous, we believe that *Port Huron* would cut against the Division. The Board found that both parties had knowledge that the pre-July 1, 2004 practice for leave utilization existed and that they had demonstrated an acceptance of that practice by their respective actions over a protracted period of time. As already noted, our review of the record supports these findings. We believe that this widely acknowledged and mutually accepted past practice would serve to amend any perceived unambiguous language of the CBA.

In sum, we agree with the Board that the language of the CBA is ambiguous and that the parties' actions evidence their acceptance of a practice not specifically expressed in the CBA. We further agree that calculation of the amount, accrual, and utilization of annual and/or sick leave is subject to negotiation between the parties. *See Appeal of N.H. Troopers Assoc.*, 145 N.H. 288, 292 (2000) (setting out three-part test to determine whether Division is obligated to negotiate particular decision). We therefore affirm the Board's decision and order on the basis that the

Division committed an unfair labor practice beginning on July 1, 2004, by unilaterally modifying the leave deduction policy without first negotiating with the Association.

*Affirmed.*

DALIANIS, DUGGAN, GALWAY and HICKS, JJ., concurred.