NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by email at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Public Employee Labor Relations Board
No. 2020-0416


APPEAL OF NEW HAMPSHIRE DEPARTMENT OF TRANSPORTATION
(New Hampshire Public Employee Labor Relations Board)

Argued: September 14, 2021
Opinion Issued: October 28, 2021


Gary Snyder, general counsel, of Concord, on the brief and orally, for the State Employees' Association of New Hampshire, Inc., SEIU Local 1984.


Office of the Attorney General, (Jessica A. King, assistant attorney general, Jill A. Perlow, senior assistant attorney general, and Daniel E. Will, solicitor general, on the brief, and Jessica A. King orally), for the New Hampshire Department of Transportation.


HICKS, J. The New Hampshire Department of Transportation (DOT) appeals an order of the New Hampshire Public Employee Labor Relations Board (PELRB) finding that DOT committed an unfair labor practice when it implemented a new commercial driver's license (CDL) medical card requirement for certain current DOT employees. We affirm.

I. Background

We recite the facts as found by the PELRB and set forth pertinent legal principles to place those facts in context. Federal law generally requires

commercial motor vehicle drivers subject to administration by the Federal Motor Carrier Safety Administration to have on their persons "the original, or a copy, of a current medical examiner's certificate" that the driver is "physically qualified to drive a commercial motor vehicle." 49 C.F.R. § 391.41(a)(1)(i) (2020). CDL medical cards are issued by federally-approved medical examiners, who determine an individual driver's qualifications based upon criteria set forth in federal regulations. 49 C.F.R. § 391.41(a)(3) (2020), (b) (2020) (amended 2021); 49 C.F.R. § 391.43 (2020) (amended 2021). The cost of the required medical exam ranges from $65 to $150. The exam is similar to a routine physical exam. A CDL medical card qualifies a driver for as little as three months or as long as two years, depending upon the medical examiner's rating. The CDL medical card requirements set forth in federal regulations do not apply to the DOT employees at issue in this case.

The State Employees' Association of New Hampshire, Inc., SEIU Local 1984 (Union) is the certified exclusive bargaining representative for certain classified DOT employees, including those at issue here. The parties' most recent collective bargaining agreement (CBA) was executed in June 2018 and expired in June 2019. Because the CBA contains an automatic extension, also known as an "evergreen" clause, the 2018-2019 CBA remains in force until a new contract is approved. See Appeal of N.H. Dep't of Safety, 155 N.H. 201, 203 (2007) (describing evergreen clause).

In early April 2019, DOT unilaterally revised the minimum qualifications necessary for certain positions so that they now require an employee to have a CDL medical card. DOT notified the Union that the new minimum qualifications apply to new hires and to current employees only upon being promoted (even temporarily), demoted, or transferred to a position that now requires a CDL medical card. Thus, a current employee occupying a position that now requires a CDL medical card need not obtain a card to remain in his or her current position. The employee must obtain a CDL medical card only if he or she is promoted, demoted, or transferred to a different position requiring a CDL medical card.

A current employee who is promoted, demoted, or transferred into a position that now requires a CDL medical card must pay the CDL medical exam fee. He or she need not renew or maintain the medical card once it expires. The failure of a promoted, demoted, or transferred employee to obtain a CDL medical card could lead to the employee's loss of DOT employment. DOT did not negotiate with the Union about the new CDL medical card requirement for current employees.

The Union filed an unfair labor practice complaint against DOT on April 30, 2019, asserting that, by adopting the medical card requirement for current employees, DOT failed to negotiate a mandatory subject of bargaining and improperly implemented a unilateral change in the terms and conditions of

employment for affected employees.  The Union did not challenge the new CDL requirement for new hires.  DOT opposed the complaint, arguing that requiring certain current DOT employees to obtain CDL medical cards in connection with a position change is a matter of managerial prerogative and a prohibited subject of bargaining.  Following a hearing, the PELRB ruled in favor of the Union.  DOT unsuccessfully moved for rehearing, and this appeal followed.

II.  Analysis

A.  Standard of Review

Our review of the PELRB's decision is governed by RSA chapter 541. RSA 273-A:14 (2010).  As the appealing party, DOT bears the burden of showing that the PELRB's decision is clearly unreasonable or unlawful.  RSA 541:13 (2021).  The PELRB's findings of fact are deemed prima facie lawful and reasonable.  Id.  We review the PELRB's rulings on issues of law de novo. Appeal of Hillsborough County Nursing Home, 166 N.H. 731, 733 (2014).  We will not set aside the PELRB's decision except for errors of law, unless we are satisfied, by a clear preponderance of the evidence, that its decision is unjust or unreasonable.  RSA 541:13.

B.  Framework for Analysis

The parties' dispute centers upon the scope of the managerial policy exception to the statutory obligation to negotiate the terms and conditions of employment.  Appeal of City of Nashua Bd. of Educ., 141 N.H. 768, 772-73 (1997); see RSA 273-A:1, XI, :3, I (2010).  The managerial policy exception is contained in the statutory definition of "terms and conditions of employment." Nashua Bd. of Educ., 141 N.H. at 773 (quotation omitted); see RSA 273-A:1, XI.  The phrase "terms and conditions of employment" means "wages, hours and other conditions of employment other than managerial policy within the exclusive prerogative of the public employer, or confided exclusively to the public employer by statute or regulations adopted pursuant to statute."  RSA 273-A:1, XI.  By statute, the phrase "managerial policy within the exclusive prerogative of the public employer" includes, but is not limited to, "the functions, programs and methods of the public employer, including . . . the selection, direction and number of its personnel, so as to continue public control of governmental functions."  Id.

We have articulated a three-step analysis to measure a particular proposal or action against the managerial policy exception.  Nashua Bd. of Educ., 141 N.H. at 773.  "First, to be negotiable, the subject matter of the proposed contract provision must not be reserved to the exclusive managerial authority of the public employer by the constitution, or by statute or statutorily adopted regulation."  Appeal of State of N.H., 138 N.H. 716, 722 (1994). "Second, the proposal must primarily affect the terms and conditions of

3

employment, rather than matters of broad managerial policy." Id. "Third, if the proposal were incorporated into a negotiated agreement, neither the resulting contract provision nor the applicable grievance process may interfere with public control of governmental functions contrary to the provisions of RSA 273-A:1, XI." Id.

"A proposal that fails to satisfy the first step [in this analysis] is a prohibited subject of bargaining." Nashua Bd. of Educ., 141 N.H. at 774. A proposal that satisfies the first step, but fails either the second or third step is a permissible subject of bargaining. Id. "A proposal that satisfies all three steps is a mandatory subject of collective bargaining." Id.

On appeal, DOT argues that the new CDL medical card requirement for current employees constitutes a prohibited subject of bargaining. Alternatively, DOT asserts that the requirement is a permissive subject of bargaining. The Union counters that the requirement is a mandatory subject of bargaining. For the reasons that follow, we agree with the Union.

### 1. Reservation to Exclusive Managerial Authority

DOT asserts that because RSA 273-A:1, XI reserves the new CDL medical requirement to its exclusive managerial authority, the requirement is a prohibited subject of bargaining. DOT observes that RSA 273-A:1, XI confers exclusive managerial authority to the public employer in the "selection, direction and number of its personnel," RSA 273-A:1, XI, and reasons that because "[s]etting minimum qualifications for a particular position is an integral aspect of the 'selection' of personnel," doing so "must be an exclusive managerial right." However, we have previously rejected such "bootstrapping attempt[s]" to find a reservation of exclusive managerial authority in RSA 273-A:1, XI itself. Nashua Bd. of Educ., 141 N.H. at 774; see Appeal of Town of North Hampton, 166 N.H. 225, 230 (2014). Rather, we have held that the reservation of authority must be found in a statute other than RSA 273-A:1, XI or in a constitutional provision or a valid regulation. Nashua Bd. of Educ., 141 N.H. at 774; see Appeal of Town of North Hampton, 166 N.H. at 230. DOT urges us to overrule Nashua Board of Education and hold that RSA 273-A:1, XI provides a statutory basis for its assertion of exclusive managerial authority to create the new CDL medical card requirement. We decline to do so for the reasons that follow.

"The doctrine of stare decisis demands respect in a society governed by the rule of law, for when governing legal standards are open to revision in every case, deciding cases becomes a mere exercise of judicial will with arbitrary and unpredictable results." Ford v. N.H. Dep't of Transp., 163 N.H. 284, 290 (2012) (quotation omitted). "When asked to reconsider a holding, the question is not whether we would decide the issue differently de novo, but whether the ruling has come to be seen so clearly as error that its enforcement was for that very

4

reason doomed." Id. (quotation and brackets omitted). Therefore, we will overturn a decision only after considering whether: (1) "the rule has proven to be intolerable simply by defying practical workability"; (2) "the rule is subject to a kind of reliance that would lend a special hardship to the consequence of overruling"; (3) "related principles of law have so far developed as to have left the old rule no more than a remnant of abandoned doctrine"; and (4) "facts have so changed, or come to be seen so differently, as to have robbed the old rule of significant application or justification." Id. (quotations omitted). "Although these factors guide our judgment, no single factor is wholly determinative, because the doctrine of stare decisis is not one to be either rigidly applied or blindly followed." Id.

DOT acknowledges that the fourth stare decisis factor "is not squarely at issue here." We interpret this acknowledgment as recognizing that the fourth factor does not weigh in favor of overruling Nashua Board of Education. We, therefore, analyze only the first three factors. See State v. Balch, 167 N.H. 329, 334 (2015).

"The first stare decisis factor examines whether a rule has become difficult or impractical for trial courts to apply." Union Leader Corp. v. Town of Salem, 173 N.H. 345, 352 (2020) (quotation omitted). "The first factor weighs against overruling when a rule is easy to apply and understand." Id. (quotation omitted). Here, the rule of Nashua Board of Education is simple to apply and understand. Accordingly, the first stare decisis factor weighs against overruling it. See id.

We are not persuaded by DOT's assertion that the rule "is by definition not workable" because Nashua Board of Education "incorrectly interpret[ed]" the statute. DOT maintains that "[d]ecisional law irreconcilable with statutory language is inherently unworkable." However, in effect, this is just an argument that Nashua Board of Education was wrongly decided and badly reasoned. Even if we were to agree with DOT, "[p]rincipled application of stare decisis requires a court to adhere even to poorly reasoned precedent in the absence of some special reason over and above the belief that a prior case was wrongly decided." Ford, 163 N.H. at 290 (quotation and brackets omitted).

The second stare decisis factor "concerns situations in which members of society may have developed operations or planned a course of action in reliance upon the challenged decision and, therefore, overruling that decision would create a special hardship for those affected." Balch, 167 N.H. at 335; see Planned Parenthood of Southeastern Pa. v. Casey, 505 U.S. 833, 854-55 (1992). This factor also weighs against overruling Nashua Board of Education. As the Union contends, public employers and unions representing public employees have been relying upon the rule for decades. See Casey, 505 U.S. at 856 (explaining that "while the effect of reliance on [a prior Supreme Court

5

decision] cannot be exactly measured, neither can the certain cost of overruling [that decision] for people who have ordered their thinking and living around that case be dismissed").

The third factor concerns whether related principles of law have developed "in such a manner as to undercut the prior rule." Balch, 167 N.H. at 335. "Such development could arise upon the promulgation of new laws or rules that render past decisions obsolete or upon the formulation of law across multiple jurisdictions in a manner that is discordant with the prior rule." Id. "The key, however, is that the law must have developed." Id.

DOT has not demonstrated that developments in the law have rendered the Nashua Board of Education rule obsolete. At best, DOT has established that in two cases, we relied upon the plain language of RSA 273-A:1, XI to rule that the public employer's conduct did not fall within the managerial policy exception, see Appeal of White Mt. Reg. Sch. Dist., 154 N.H. 136, 140-41 (2006); Appeal of Pittsfield School Dist., 144 N.H. 536, 539-40 (1999); and in a third case, we distinguished Nashua Board of Education, see Appeal of Nashua Sch. Dist., 170 N.H. 386, 392-97 (2017). Moreover, DOT fails to acknowledge the recent cases applying Nashua Board of Education. See Appeal of Strafford County Sheriff's Office, 167 N.H. 115, 121 (2014); Appeal of Town of North Hampton, 166 N.H. at 230. We conclude that no development of law since we decided the case "has implicitly or explicitly left" Nashua Board of Education "behind as a mere survivor of obsolete . . . thinking." Casey, 505 U.S. at 857. Thus, the third stare decisis factor also weighs against overruling Nashua Board of Education. Based upon our review of the first three stare decisis factors, and DOT's acknowledgement regarding the fourth factor, we decline DOT's invitation to overrule Nashua Board of Education.

Alternatively, DOT asserts that RSA 21-G:9 reserves to it the exclusive managerial authority to adopt the new CDL medical card requirement. See RSA 21-G:9 (2020). RSA 21-G:9 provides, in pertinent part, that the Commissioner of DOT is the "chief administrative officer" of the department and "shall . . . [e]xercise general supervisory and appointing authority over all department employees, subject to applicable personnel statutes and rules." RSA 21-G:9, II(c). However, the general grant of authority in RSA 21-G:9 does not expressly reserve to DOT the exclusive authority to create a new CDL medical card requirement.

Because DOT has failed to identify any "independent statute, or any constitutional provision or valid regulation" that reserves to it "the exclusive authority" to adopt a new CDL medical card requirement for current employees, we conclude that the first step in our analysis is satisfied, and that, therefore, the requirement is not a prohibited subject of bargaining. Nashua Bd. of Educ., 141 N.H. at 774. We now proceed to the second step in the analysis.

6

## 2.  Primarily Affecting the Terms and Conditions of Employment

To meet the second step of the analysis, the new CDL medical card requirement "must primarily affect the terms and conditions of employment, rather than matters of broad managerial policy."  Appeal of State, 138 N.H. at 722.  "Matters of managerial policy include, at least, 'the functions, programs and methods of the public employer,'" including "'the selection, direction and number of its personnel.'"  Id. (quoting RSA 273-A:1, XI).  "Often, both the public employer and the employees will have significant interests affected by a proposal."  Id.  "Determining the primary effect of the proposal requires an evaluation of the strength and focus of the competing interests."  Id.

Here, the PELRB took into account "the numerous ways certain DOT employees are affected" by the requirement, "including costs to employees, how the card requirement [affects] opportunities for advancement or movement to a preferred location, and job security."  The PELRB found that the requirement "is being implemented at the individual employee's expense and has the effect of a wage reduction" given that "[t]here is no right to reimbursement included in the medical card mandate."  The PELRB noted that "[e]mployees are responsible for the CDL medical card exam fees and an employee who takes the exam multiple times in an effort to obtain a medical card will incur multiple exam fees."  The PELRB further found that "the cost to employees and the implementation of the medical card requirement are inextricably intertwined" such that they could not be separately analyzed.

The PELRB found that "[t]he medical card requirement affects other areas of employment as well" because it is "required before an employee can obtain a promotion or accept a temporary promotion" or "can complete a lateral transfer (same position in a different location)."  The PELRB determined that the medical card requirement "creates a potential barrier to the exercise of contractual 'bumping rights' in the event a laid off employee who is already operating a plow truck is willing to accept a demotion into another plow truck operator position that requires a CDL medical card."

The PELRB weighed these "significant employee interests" against "the State's interests in imposing the new CDL medical card requirement," and considered how the requirement "serves and advances the interests of management."  The PELRB noted that "[a]s justification for the new CDL medical card requirement," DOT "raised general concerns about roadway safety and employee health" and maintained "that the medical card will address certain risks [DOT] perceives in these areas."  However, the PELRB determined that DOT failed to support its "explanations with any data or specific examples which indicate [it] has identified a problem area which can be effectively addressed through the CDL medical card requirement."

7

Specifically, the PELRB found "scant, if any, evidence at [the] hearing which showed that there has been an increase in accidents or incidents involving DOT employees attributable to any of the areas covered by the CDL medical exam." The PELRB also found "little or no evidence that existing supervisory systems are inadequate to address a particular DOT employee's fitness to safely perform the duties of a particular position." See N.H. Admin. R., Per 1003.01(a)-(b) (permitting a public employer to remove a full-time employee when the employee "is physically or mentally unable to perform the essential functions of the position to which appointed" or when the employee's "physical or mental condition creates a direct threat or hazard for the employee, the employee's co-workers or clients of the agency"). The PELRB further noted that the lack of a requirement to renew the medical card "dilutes [the card's] utility . . . as a tool to monitor DOT employee fitness for the duties of their positions, and undermines any argument that the medical card requirement is somehow necessary to maintain and promote safety on the roads." For instance, the PELRB observed, "an employee could . . . remain at the employee's current location . . . and continue to operate a plow truck without a CDL medical card, but [could not] laterally transfer to [a different location] to perform the same job without obtaining the CDL medical card." The PELRB continued, "Additionally, if such an employee obtains a three month card and transfers to [a different location] there is no requirement that the employee 'renew' the medical card as a condition of continued employment at the [new] location."

After considering the parties' respective interests, the PELRB concluded that the CDL medical card requirement "primarily affects the terms and conditions of employment of current employees, and not matters of broad managerial policy." Accordingly, the PELRB decided that the new CDL medical card requirement for current employees satisfies the second step of the Appeal of State analysis.

On appeal, DOT contends in a single, conclusory sentence that the PELRB erroneously determined that DOT failed to submit "sufficient evidence of its substantial managerial policy interests." However, the record submitted on appeal supports that determination. For instance, at the hearing, a DOT witness testified that DOT implemented the CDL medical requirement for current employees to reduce the risk to "safety of the traveling public" from DOT employees driving with health conditions that put the public and the employees at risk. The witness agreed, however, that, as implemented by the DOT, "a CDL medical card is not required at all times for [all DOT employees]." The witness explained that DOT implemented the requirement for new hires and for current employees upon a change in position because those were the processes over which DOT "had control." The witness testified that, after an employee's CDL medical card expires, DOT does not require the employee to renew or maintain it.

8

Another witness testified that the medical exam for the CDL medical card is "a very brief physical," that is "usually [not done by] . . . primary care physicians." He likened it to being "triaged in an ER." He testified that the exam "can last anywhere from 10 minutes to 20 minutes" and involves checking the employee's vision, hearing, blood pressure, oxygenation, and reflexes. As a result, he testified that obtaining a CDL medical card "doesn't mean you're healthy." Based upon our review of the record submitted on appeal, we conclude that the PELRB's determination that DOT failed to submit "sufficient evidence of its substantial managerial policy interests" is neither clearly unlawful nor unreasonable. See RSA 541:13.

DOT next argues that the PELRB "employ[ed] the wrong standard by assessing the overall value of the proposal rather than examining the competing interests" and by "focus[ing] solely on the [Union's] interests in bargaining the CDL medical card requirement." We do not share DOT's interpretation of the PELRB's order. See Guy v. Town of Temple, 157 N.H. 642, 649 (2008) ("[T]he interpretation of a tribunal's order presents a question of law, which we review de novo."). The PELRB identified DOT's interests in imposing a CDL medical card requirement on current employees, examined DOT's evidence that the requirement served those interests, and balanced those interests against the requirement's impact on employees.

DOT next argues that because the new CDL medical card requirement for current employees relates to "selection" of personnel, it necessarily primarily concerns issues of broad managerial policy. See RSA 273-A:1, XI (providing that the State's managerial prerogative includes "the public employer's organizational structure, and the selection, direction and number of its personnel"). However, the second part of our analysis "cannot be resolved through simple labels offered by management, such as 'restructuring' or 'personnel reorganization,'" Nashua Bd. of Educ., 141 N.H. at 774, or "selection" as DOT offers here. Rather, as we have repeatedly acknowledged, "in many cases, like the present one, a proposal or action will touch on significant interests of both the public employer and the employees," requiring a balancing to determine whether the impact is primarily on managerial matters or the protected rights of employees. Id.; see, e.g., Appeal of Town of North Hampton, 166 N.H. at 230.

Moreover, the record supports the PELRB's determination that employees bear the cost of implementing the requirement, and that those costs affect wages and opportunities for advancement. For instance, a witness at the hearing testified that obtaining a CDL medical card costs between $65 and $150, and that DOT does not reimburse the employee for that cost. He testified that under the new CDL medical card requirement, before accepting a promotion, demotion, or transfer into a CDL medical card position, an employee now has to pay the fee associated with obtaining the card.

The PELRB was not compelled to find on this record that, as DOT asserts, the "impact[s] [on] employees through cost or opportunities for advancement . . . are secondary" to matters of broad managerial policy. In light of the PELRB's factual determinations, which are supported by the record, we agree with the PELRB's legal conclusion that the impact of the new CDL medical card requirement falls primarily on the protected rights of employees rather than on managerial matters. See Appeal of State, 138 N.H. at 722; Nashua Bd. of Educ., 141 N.H. at 774. Accordingly, like the PELRB, we conclude that the second step of the analysis is satisfied. We turn now to step three.

### 3. Interference with Public Control of Governmental Functions

To satisfy the third step in the analysis, and, therefore, be a mandatory subject of bargaining, the new CDL medical card requirement, if incorporated into a CBA, must not "interfere with public control of governmental functions contrary to the provisions of RSA 273-A:1, XI." Appeal of State, 138 N.H. at 722. The PELRB found "a dearth of evidence which demonstrates that the introduction of a medical card requirement is needed or significant to any meaningful degree to . . . fullfil[] or advance[] . . . any State objectives to improve employee health or roadway safety." The PELRB concluded, therefore, that there was "insufficient evidence to show that treating the CDL medical card requirement as a mandatory subject of bargaining will interfere with public control of governmental functions."

As previously discussed, the record supports the PELRB's determination that, although DOT broadly asserted that the CDL medical card requirement for current employees was necessary to protect employee health and public safety, DOT failed to demonstrate that the requirement actually serves those goals. In light of the disconnect between DOT's goals and its implementation of the CDL medical card requirement for current employees, we agree with the PELRB that DOT failed to establish that treating the requirement as a mandatory subject of bargaining will interfere with public control of governmental functions.

### C. Conclusion

Because all three steps of the managerial policy exception analysis are satisfied in this case, like the PELRB, we conclude that the new CDL medical card requirement for current employees is a mandatory subject of bargaining. See Appeal of Town of North Hampton, 166 N.H. at 231.

Affirmed.


BASSETT, HANTZ MARCONI, and DONOVAN, JJ., concurred.